UNITED STATES

v.

Sergeant Clyde R. ROTRAMEL, FR 495–50–8013 437th Organizational Maintenance Squadron Twenty-First Air Force (MAC).

ACM 21900.

U. S. Air Force Court of Military Review.

24 Oct. 1975.

Appellate counsel for the Accused: Colonel Jerry E. Conner and Major John A. Cutts III. Captain James J. Gonzales filed a brief on behalf of the accused.

Appellate counsel for the United States: Colonel C. F. Bennett, Colonel Julius C. Ullerich, Jr., and Captain Frederick P. Waite.

DECISION

ORSER, Judge:

Tried by a general court-martial with members, the accused was convicted, despite pleas to the contrary, of one offense

each of wrongful possession of lysergic acid diethylamide (LSD), wrongful possession of marihuana and absence without leave, in violation of Articles 92, 134 and 86, respectively, Uniform Code of Military Justice. The approved sentence extends to a dishonorable discharge confinement at hard labor for three months, forfeiture of all pay and allowances and reduction to the grade of airman basic.

Though several errors have been assigned by trial and appellate defense counsel, our disposition of the case necessitates that we address only one error asserted by trial defense counsel. This assignment alleges:

THE MILITARY JUDGE ERRED BY ADMITTING OVER DEFENSE OBJECTION THE EVIDENCE SEIZED FOLLOWING THE GATE SEARCH OF THE ACCUSED'S VEHICLE.

We agree.

At approximately 0115 hours on 15 December 1974, Airman Randall A. Plyler, a security police guard, stopped a motor vehicle operated by the accused as it was entering Charleston Air Force Base, South Carolina. Plyler testified his purpose in stopping the vehicle was to conduct an identification check and a vehicle search. He had earlier been instructed, he said, that during his tour of duty as a base entry guard he was to conduct such checks and random vehicle searches, "[b]y order of the base commander." Plyler stated this information had been relayed to him by his flight chief, a Technical Sergeant Bagnull, during the guard mount formation at the commencement of his tour of duty.

At the time Airman Plyler signaled the accused to stop he did not suspect him of any criminal activity. The security policeman's decision to select the accused's vehicle for inspection was dictated solely by traffic flow circumstances. The accused just happened to be approaching the gate at a time when traffic conditions permitted another required vehicle search.

After the accused identified himself, Airman Plyler directed him to submit to a "random vehicle search in accordance with the base commander's order." The accused

acquiesced and Airman Plyler commenced his search. While examining the ashtray in the vehicle, Plyler discovered what he believed to be marihuana seeds. As a result, he ceased his search, apprehended the accused and directed him to accompany him into the gatehouse. There, in the accused's presence, Plyler telephonically requested that a canine unit and law enforcement patrol be dispatched to the scene. According to Plyler, the accused then asked him if there was any way he could "get rid of the grass out of his van." He also informed the security policeman that he did not want a dog in his van.

The requested police dog and noncommissioned officer patrolmen forthwith arrived, and the accused was advised of his rights pursuant to Article 31, Code, supra. He was subjected to a body search incident to his apprehension and substances subsequently identified as marihuana and LSD were found in the jacket he was wearing. Plyler also asked the accused for permission to search his vehicle, at the same time informing him that he was not required to consent. According to Plyler, the accused verbally consented and further evidenced his permission by, at Plyler's request, writing on a blank sheet of paper the words, "You have consent to search my van," followed by his signature.

The accused's vehicle was thereafter searched by the canine unit and a substantial quantity of marihuana was discovered in the glove compartment. At trial, the drugs found on the accused and in his vehicle were admitted in evidence over vigorous defense objection and constituted the evidence of his guilt respecting Charges I and II.

During the cross-examination of Airman Plyler, the witness identified a document entitled "OI 125–11," dated 1 November 1974, as a security police squadron operating instruction issued by the chief of the squadron. The document purports to establish procedures for entry and internal control of personnel and vehicles on Charleston Air Force Base. Under the section labelled "Contraband Checks," the following appears:

(b) Narcotic Checks: Inspections of personnel/vehicles for the illegal possession of narcotics will be conducted as often as deemed necessary. As a minimum at least one check per shift will be conducted when a narcotic detection dog team is on duty. A minimum of ten vehicles, selected at random will be accomplished. Narcotic checks will be conducted by the dog team handler assisted by a base patrolman in the grade of E–4 or above, preferable [sic] the senior patrolman. In the event an alert is dected [sic] sufficient to establish probable cause the individual or in the case of vehicle owner/operator of the vehicle will be advised of his rights pursuant to Article # 31, 5th Amendment, prior to continuing the search.

In spite of his acknowledged awareness of the quoted procedures, Airman Plyler professed to be "not sure" whether the language represented the policy and direction of his commander respecting gateway searches for narcotics. Aside from Airman Plyler's testimony that he initiated the search of the accused's vehicle on his own as a result of the relayed "order of the base commander," the record of trial contains no explanation or justification for the discrepancy between his conduct and the required procedure for narcotic inspections specified in the operating instruction.

Recently this Court, speaking through Senior Judge Roberts, held that random searches of privately owned vehicles at entrance gates of Air Force installations are lawful, even though conducted without probable cause, consent or cautionary advice of any kind. *United States v. Blade*, 49 C.M.R. 646 (A.F.C.M.R. 1974), pet. denied, 23 U.S.C.M.A. 667, —— C.M.R. —— (28 Aug. 1975). Even more recently, we affirmed, on the basis of the principles enunciated in *Blade*, a gateway search of a vehicle departing an installation even though the inspecting officer's decision to search the accused's particular vehicle was in part motivated by a report of recently stolen property. *United States v. Chase*, 50 C.M.R. 435 (A.F.C.M.R. 1975), pet. granted, —— U.S.C.M.A. ——, —— C.M.R. —— (18 July 1975).

■ Relying on decisions of the United States Court of Military Appeals as well as Federal cases, we declared in *Blade*, supra, that a commander's inherent authority to conduct "administrative" searches or inspections of persons or property, without regard to probable cause or consent, may be exercised at the installation gateway, "provided that the overriding purpose is the security of the command rather than the acquisition of evidence of crimes." 49 C.M.R. at page 648, citing *United States v. Brown*, 10 U.S.C.M.A. 482, 28 C.M.R. 48 (1959); *United States v. Gebhart*, 10 U.S.C.M.A. 606, 28 C.M.R. 172 (1959); *United States v. Poundstone*, 22 U.S.C.M.A. 277, 46 C.M.R. 277 (1973); *United States v. Unrue*, 22 U.S.C.M.A. 466, 47 C.M.R. 556 (1973); *United States v. Gaddis*, 41 C.M.R. 629 (A.C.M.R. 1969); and *United States v. Dukes*, 48 C.M.R. 443 (N.C.M.R. 1973). As should be obvious, such searches, involving as they do a compromise in some degree of an "individual's justifiable expectation of privacy" under the Fourth Amendment, must be subjected to close judicial scrutiny. *United States v. Poundstone*, supra. Thus, they will be sanctioned only when approved by a commander charged with the responsibility for the security and effectiveness of his command, reasonable in the way in which executed, and not employed to circumvent an individual's right to be free from unlawful searches. *United States v. Blade* and *United States v. Chase*, both supra.

■ Applying these principles to the case at bar, we first observe that the gateway search executed by Airman Plyler was reasonable in the sense that the accused's vehicle was singled out for attention simply because he happened to be approaching the gate when the traffic flow was such as to permit a search. The real problem is that the evidence does not establish to our satisfaction that the initial intrusion into the accused's vehicle by Airman Plyler was authorized by the responsible commander.

To be sure, Airman Plyler testified that his action was motivated by instructions

from his superior that he was to conduct random vehicle searches by order of the base commander. If the record contained only that evidence, we might be constrained to conclude by application of the principle of regularity, and in the absence of any objection by the defense, that the initial search of the accused's vehicle was an action authorized by the commander. See *United States v. Barry*, 6 U.S.C.M.A. 609, 20 C.M.R. 325 (1956); *United States v. Taylor*, 2 U.S.C.M.A. 389, 9 C.M.R. 19 (1953). But such is not the case. For directly opposed to Airman Plyler's relayed and otherwise unsubstantiated information is the security police written, standing instruction that random gateway inspections for narcotics must be conducted by dog teams with the assistance of a base patrolman of noncommissioned officer rank.

On the basis of the subject matter of the referenced instruction, devoted as it is to entry and internal control of vehicular activity on the air base, we can only presume the specific procedures were coordinated and instituted with the approval of the installation commander, the authority ultimately responsible for the security of the base. In fact, the section of the instruction dealing with contraband checks, within which the procedures for conducting narcotics inspections are detailed, specifies that "[v]ehicle shake-down inspections will be conducted as directed by the Chief, Security Police in coordination with the installation commander."

■ Of course, neither Airman Plyler nor for that matter, the noncommissioned officer in charge of his flight possessed any authority to order random searches at the gateway. In military law that authority is possessed only by the commanding officer responsible for the protection of the installation and its resources. Manual for Courts-Martial, 1969 (Rev.), paragraph 152; *United States v. Drew*, 15 U.S.C.M.A. 449, 35 C.M.R. 421 (1965); *United States v. Murray*, 12 U.S.C.M.A. 434, 31 C.M.R. 20 (1961). The function of law enforcement personnel is to execute search authorizations strictly within the terms of such limitations as are imposed by the commander.

■ We conclude that the language of the security police instruction evidenced the means and manner in which random gateway searches were to be conducted, and the Government failed to establish that Airman Plyler's initial search of the accused's vehicle was within the scope of the inspection system authorized by the commander. Such search was accordingly unlawful, and any evidence obtained thereby inadmissible. See *United States v. Hendrix*, 21 U.S.C.M.A. 412, 45 C.M.R. 186 (1972), citing *Woo Lai Chun v. United States*, 274 F.2d 708 (C.A 9th Cir. 1960). We further conclude that the evidence obtained as a result of the ensuing search of the accused's person incident to his apprehension was inadmissible. Manual for Courts-Martial, supra, paragraph 152; *United States v. Ball*, 8 U.S.C.M.A. 25, 23 C.M.R. 249 (1957).

Without question, the apprehension was based upon the discovery of the marihuana seeds in the accused's vehicle during the initial unlawful search. A search based on "exploitation" of evidence obtained during an unlawful search is likewise unlawful and any evidence derived thereby inadmissible against an accused. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Bishop*, 23 U.S. C.M.A. 157, 48 C.M.R. 773 (1974); *United States v. Peurifoy*, 22 U.S.C.M.A. 549, 48 C.M.R. 34 (1973); *United States v. Moore*, 19 U.S.C.M.A. 586, 42 C.M.R. 188 (1970). No clearer case of "exploitation" can be envisioned than the circumstances at bar.

■ The evidence subsequently found in the accused's vehicle following his consent to its search must suffer a similar fate. Consent to a search must be proved by the Government "by clear and positive" evidence "and it must be established that there was no duress or coercion actual or implied." *United States v. Herberg*, 15 U.S.C. M.A. 247, 35 C.M.R. 219 (1965); *United States v. Decker*, 16 U.S.C.M.A. 397, 37 C.M.R. 17 (1966). Here, the accused's consent was undoubtedly influenced by the evidence illegally obtained during the initial search. In our view the prior illegal con-

duct injected an element of duress or coercion into the proceedings and the Government failed to sustain its heavy burden of establishing that the accused's consent was unaffected thereby. At the time of the accused's consent he was in custody as a result of the initial unlawful search. A dog unit had been summoned for the purpose of searching his vehicle. Under the circumstances, we are not satisfied that the consent provided by the accused sufficed to purge the taint of the initial illegality. Manual for Courts-Martial, supra, paragraph 152; see *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Decker*, supra; cf. *United States v. Foecking*, 22 U.S.C.M.A. 46, 46 C.M.R. 46 (1972).

For the reasons stated, the findings of guilty to Charges I and II and the specifications thereunder are incorrect in law and are set aside. The findings of guilty to the remaining charge and specification are unaffected by our decision and are affirmed.

The convening authority may direct a rehearing respecting the charges herein set aside provided he determines there is available evidence which may establish that the procedure utilized in conducting the initial search of the accused's vehicle was authorized by the responsible commander. In lieu of such action, the convening authority may dismiss the charges and reassess the sentence on the basis of the findings of guilty herein affirmed. Since such findings are for a four-day absence without leave (an offense not ordinarily referred to trial by general court-martial), rather than reassessing the sentence, the convening authority is invited to consider the alternative of dismissing the remaining findings of guilty, and, if appropriate, nonjudicial disposition thereof.